Law Offices of Shepard S. Kopp
Shepard S. Kopp, Esq.  California SBN: 174612
233 Wilshire Blvd.
Suite 900
Santa Monica, California  90401
Telephone  (310) 914-4444
Facsimile  (310) 914-4445
shep@shepardkopplaw.com
Attorney for Plaintiffs

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BOB BAFFERT and BOB BAFFERT RACING STABLES, INC.,<br>　　　　Plaintiffs,<br>vs.<br>JUSTIN A. WUNDERLER and DANIEL DICORCIA,<br>　　　　Defendants. | '23CV1774 RSH BLM<br><br>**Jury Trial Demanded** |

**COMPLAINT**

COMES NOW the Plaintiffs, Bob Baffert ("Baffert") and Bob Baffert Racing Stables, Inc., by and through counsel, and hereby state as follows for their Complaint against the Defendants, Justin Wunderler and Daniel DiCorcia:

**PRELIMINARY STATEMENT**

1.　　This lawsuit is the response to a series of escalating threats and criminal conduct by Defendants Justin Wunderler and Daniel DiCorcia against Plaintiffs Bob Baffert and his family. Over the past several months, Defendants have urged others to engage in violent behavior toward Baffert and his family, baselessly accused Baffert of criminal conduct, and attempted to extort Baffert and his family under threats to his business, reputation, and occupational license.

1

**JURISDICTION AND VENUE**

2. This Court has jurisdiction over this matter pursuant to its original jurisdiction as set forth in 28 U.S.C. § 1332. This is a civil action between parties of diverse citizenship, seeking relief and damages in excess of $75,000.

3. To the extent one of Baffert's claims does not reach the $75,000.00 jurisdictional minimum, this Court has supplemental jurisdiction over Baffert's state and common law claims by virtue of the provisions of 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution.

4. This Court has personal jurisdiction over the Defendants their intentional criminal act of extortion was directed specifically at a California resident and was an attempt to extort money from a California business. Defendants further directed their defamatory statements with the specific intent to do harm to a California resident and his business, and their tortious behavior is directed squarely at the State of California. The present claims arise from those contacts with California. In the totality of the circumstances, Defendants could reasonably expect to be haled into Court in California for their conduct.

5. Venue is proper in this district under 28 U.S.C. § 1391 because Plaintiff Bob Baffert, against whom the threat of extortion was made, maintains a residence in this district, and this Court has personal jurisdiction over both Defendants.

**PARTIES**

6. Baffert is an individual and resident of the State of California who is an internationally recognized thoroughbred trainer. He has been a trainer for over 47 years, and the horses he has trained have won races at the highest level of the sport. His horses have won the Kentucky Derby seven times; the Preakness Stakes eight times; the Belmont Stakes three times;

and Breeders Cup Races eighteen times. Of the thirteen American Triple Crown Winners in history, Baffert has trained two of them: AMERICAN PHAROAH in 2015 and JUSTIFY in 2018. Baffert has since won the Kentucky Derby with AUTHENTIC in 2020 and MEDINA SPIRIT in 2021 to push his record number of Triple Crown race wins to seventeen, including a record seven editions of the Derby. Through early May 2021, Baffert has won more than 3,100 races, with purse earnings of $320,410,647 (the third highest of all time). Baffert was elected to the National Thoroughbred Hall of Fame in 2009.

7. Baffert holds a lawful, unencumbered license in good standing to train and race thoroughbred horses in numerous jurisdictions, including California, New York, Kentucky, Maryland, and Arkansas. To obtain these licenses, Baffert must have demonstrated to these racing jurisdictions that he has the character, experience, and moral fitness to race and train thoroughbred racehorses.

8. Defendant Justin Wunderler resides in Waretown, New Jersey, and is a part-time pari-mutuel thoroughbred racing bettor. Mr. Wunderler has a substantial social media presence and following under the pseudonym "Swifthitter."

9. Defendant Wunderler recently received a judgment of conviction for criminal online harassment and a subsequent money judgment against the victim, a former girlfriend, for publishing intimate photos online without the ex-girlfriend's consent.

10. Defendant Daniel DiCorcia resides in Point Pleasant, New Jersey, is a part-time pari-mutuel thoroughbred racing bettor, and operates an apparel store called "BarShoeLife" that sells racing-related apparel. Mr. DiCorcia also has a substantial social media presence and following under the pseudonyms "Shoe," "@shoeeatsturfforbreakfast" and "barshoelife."

## OPERATIVE FACTS

11. Plaintiff hereby incorporates by reference paragraphs 1 through 10 above as though fully set forth herein.

12. Over the past two years, Baffert has been working with industry participants and through the legal process to repair his reputation and standing in the industry following an alleged violation of medication rules involving the 2021 Kentucky Derby. That controversy stemmed from the use of a topical ointment to treat a rash in the weeks leading up to the Derby, and the use of the ointment caused a trace detection of the permitted therapeutic medication "betamethasone" in a post-race biological specimen.

13. The media frenzy that ensued resulted in major industry stakeholders — specifically Churchill Downs, Inc., and the New York Racing Association, Inc. — taking action to ban Baffert from major racetracks in Kentucky and New York for various periods of time. Baffert's position with Churchill Downs, specifically, is fluid and tenuous. Churchill Downs has repeatedly referenced negative media coverage associated with Baffert as grounds for extending his ban from the Churchill Downs Racetrack and the Kentucky Derby.

14. Over that same time, Defendants, who have a substantial following on social media, have engaged in an escalating pattern of unlawful and threatening behavior directed specifically at Baffert and his family. This escalating pattern of outrageous behavior is specifically intended to accrue more followers and personal monetary gain.

15. Before the Belmont Stakes in New York, Mr. Wunderler specifically asked his followers to bring dangerous objects to hurl at Baffert and his family.

16. Shortly thereafter, Mr. Wunderler posted a picture of Baffert's house in California and claimed that he "slaughters horses on National TV."

17. In conjunction with these threats of violence, Mr. Wunderler has repeatedly, privately and publicly, demanded large sums of money in exchange for ending his vexatious, noxious, and unlawful behavior. For example:



18. After the Belmont Stakes in New York, Defendants collectively spearheaded a conspiracy theory alleging that Baffert was scratching his horses because of an adverse reaction the horses were having to "blood doping" with erythropoietin or "EPO." These accusations were the latest in a long-line of express accusations that Baffert was "blood doping," including baseless accusations and implications by Defendants that some of Baffert's horses died due to "blood doping."

19. Blood doping is a criminal felony offense that would disqualify Baffert from renewing his training license in any racing jurisdiction.

20. Baffert does not engage in blood doping, and public investigations into various racing incidents have repeatedly noted that there is no evidence that Baffert engages in blood doping.

21. Defendants closely follow investigations involving Baffert and are aware of the contents of public reports that contradict their false statements.

22. Defendants now claim to possess two videos of unknown content that they allege will "end" Baffert's career as a thoroughbred trainer if exposed to the media, regulatory agencies, and racetrack operators.

5

23.     Based upon information and belief, the alleged videos are deceptively edited to cast Baffert and his staff in a false light with the specific intent of manufacturing a scandal, whereas the full context and character of the video would affirmatively refute such characterization.

24.     Defendants announced the alleged existence of the videos on September 5, 2023, with the following message on "X," the platform formerly known as Twitter:



25.     The next day, Mr. Wunderler posted the following statement on "X":



26.     Mr. Wunderler also warned of an escalating series of threats to Baffert's business and reputation unless he ceased his business operations and surrendered his license:



27. Mr. Wunderler and his co-conspirator Mr. DiCorcia further attempted to substantiate his threats and stated his express intent to find the "best way to do damage" to Baffert and his business:



28. Mr. Wunderler and Mr. Dicorcia also publicly posted the following demand for money, Baffert's wife, and two horses in exchange for a non-disclosure agreement:



29. Defendants appeared together for an interview on "Spaces" in which they boasted of their possession of the alleged video, repeatedly stated their intent to "take down" Baffert, and threatened the imminent release of the alleged video to the New York Times.

30. Though publicly attempting to pass off the "three team trade" as a "joke" (likely as some attempt at public damage control), Defendant Wunderler sent the following via text message on September 7, 2023, to a third party, with the direction to forward the message to Baffert's representatives:



31. Consistent with Mr. Wunderler's express directive, the above text message was delivered to Baffert's wife, Jill.

32. Baffert did not comply with Defendants' extortionist demands, and Defendants now claim to have released the videos to an unnamed reporter.

## COUNT 1
### (Civil Extortion)

33. Baffert repeats and realleges the allegations in paragraphs 1 through 32 of this Complaint as though fully set forth herein.

34.     Under California law, any person who, with the intent to extort money, sends or delivers a message to extort money is punishable in the same manner as if such money or property were actually obtained by means of such threat and is likewise liable in tort.

35.     Mr. Wunderler and Mr. Dicorcia engaged in a conspiracy to extort money from Baffert, sent a text message demanding a sum certain of money, with specific payment instructions for wiring money, in exchange for a promise not to release information Defendants allege is so damaging that it will end Baffert's career.

36.     In furtherance of this conspiracy, Mr. Wunderler instructed a third party to deliver that message to Baffert's representatives, and that message was in fact delivered to Baffert when it was forwarded to Baffert's wife.

37.     Defendants, acting as co-conspirators, drafted and sent the text message with the express and specific intent to extort money from Mr. Baffert.

38.     Defendants' publicized threats and criminal acts are expressly aimed at destroying a business venture worth tens of millions of dollars and toward causing irreparable harm to Baffert's reputation and livelihood.

39.     Defendants' demands, their threatened harms to Baffert's reputation and business, and the mental anguish and distress caused by Defendants' constant barrage of threatening behavior have caused and will imminently cause damages in excess of $75,000.

40.     Defendants' conduct was reckless; callously indifferent to Baffert's rights; and motivated by the specific, malicious intent to harm Baffert, his family, his business, and his reputation; entitling Baffert to punitive damages in excess of this Court's jurisdictional minimum.

## COUNT 2
### (Defamation)

41. Baffert repeats and realleges the allegations set forth in paragraphs 1 through 40 as though fully set forth herein.

42. Defendants made various statements accusing Baffert by name of engaging in "blood doping" and committing other criminal acts of animal cruelty.

43. These statements were published and widely disseminated on the social media platform "X," formerly known as Twitter, to an audience that reasonably understood that the statements were about Baffert and that the statements accused Baffert of "blood doping."

44. Specifically, Mr. Wunderler accused Baffert of scratching the thoroughbred racehorse "Muth" because of a "reaction to EPO. 100 %%%" and claimed at least twice that a "bad shipment of EPO has hit [Baffert's] barn."

45. Mr. Wunderler has also alleged numerous times that Baffert "blood doped" the thoroughbred racehorse *Medina Spirit*, who won the Kentucky Derby. Mr. Wunderler's statements have implied that *Medina Spirit* died from blood doping, despite the official investigation revealing no evidence to support that assertion.

46. Over the past year, Mr. Wunderler has publicly accused Baffert by name of blood doping horses in several dozen posts on Twitter and "X."

47. On September 9, 2023, Mr. Wunderler publicly accused Baffert on "X" of "juicing" Triple Crown Winner *Justify*. Specifically, Mr. Wunderler stated, "Justify was a Natural Talent and Baffert used all kind of shit on em. And his career short lived. Juiced snd [sic] talent for stud deal."

48. On September 6, 2023, Mr. Wunderler publicly accused Baffert on "X" of intentionally maiming, torturing, wounding, or killing his horses and posted a screenshot of California Penal Code Section 597, defining such acts as a criminal offense.

49. Blood doping, "juicing," and other acts of animal cruelty are criminal felony offenses of an immoral character.

50. Allegations of blood doping, "juicing," and animal cruelty are harmful to any trainer's business, trade, or profession, but especially to high-profile trainers like Baffert who face higher scrutiny than the average trainer.

51. Defendants' statements are defamatory per se.

52. Defendants' statements accuse Baffert by name of committing specific conduct. Those statements can be proven as true or disproven as false. Their express accusations of criminal activity cannot fairly be characterized as fair commentary or opinion.

53. Defendants' statements and accusations are false.

54. Baffert does not engage in "blood doping."

55. Defendants' accusations of criminal acts of animal cruelty are objectively false.

56. Defendants levied these accusations despite knowing that multiple investigations have repeatedly found no evidence that Baffert engages in "blood doping" and knowing that no government agency has ever even accused Baffert of "animal cruelty."

57. Defendants published their accusations in reckless disregard for their falsity.

58. Collectively, and as of September 8, 2023, Defendants' statements have been viewed hundreds of thousands of times on social media platforms.

59. Defendants also threaten the imminent release of a video they claim depicts Baffert engaging in conduct that will "end" his career.

60. Upon information and belief, the videos are deceptively edited to cast Baffert and his staff in a false light, and the intent to publish such videos was not to foster the quest for truth but to gain social media followers through the sensationalist nature of such falsehoods.

61. Upon information and belief, Defendants are aware that the videos' content gives an impression that is contrary to the well-pleaded truth that the full context and true character of the video would provide.

62. According to Defendants' statements on "X" and in interviews, Defendants have published and distributed the videos to friends and journalists.

63. Defendants published this video in reckless disregard for the truth or falsity of what they allege the video conveys.

64. Defendants' statements have caused and threaten imminently to cause damages in excess of $75,000.

65. Defendants' conduct was reckless; callously indifferent to Baffert's rights; and motivated by the specific, malicious intent to harm Baffert, his family, his business, and his reputation; entitling Baffert to punitive damages in excess of this Court's jurisdictional minimum.

## DEMAND FOR RELIEF

WHEREFORE, Baffert seeks judgment in his favor as follows:

A. For the mental anguish, anxiety, and duress Defendants have caused by virtue of their repeated threats to Baffert's business and family by means of their unlawful statements, Plaintiffs request compensatory damages in excess of $75,000.00.

B. Because Defendants acted with malice, oppression, and fraud in their criminal extortion of Baffert and their knowingly false statements, Plaintiffs request an award of punitive

damages in excess of this Court's jurisdictional minimum to deter similar conduct by Defendants and others.

  C. An order requiring Defendants to produce the video to the Court for the Court's and Plaintiffs' review.

  D. Such injunctive relief as the court may deem appropriate or necessary to protect Plaintiffs' rights;

  E. Costs incurred herein, including reasonable attorney's fees; and

  F. Any further relief to which the court or a jury determines Plaintiffs may be entitled.

Respectfully submitted,
*/s/ Shepard S. Kopp*
Shepard S. Kopp